## THE CHELSEA.

### (District Court, S. D. New York. March 4, 1905.)

COLLISION—STEAMER AND SCHOONER MEETING—EXCESSIVE SPEED IN FOG.

    A steamer *held* in fault for a collision with a schooner in Long Island Sound in a fog because of her excessive speed of 10 knots, and her change of course after the schooner was seen on nearly a meeting course. The schooner *held* not chargeable with contributory fault, although her speed was about six knots, it appearing that the fog was not thick where she was, and that she was reducing sail as she entered the dense fog.

    [Ed. Note.—Collision rules—Speed of steamers in fog, see note to The Niagara, 28 C. C. A. 532.]

In Admiralty. Suit for collision.

Peter S. Carter, for libellants.

Carpenter, Park & Symmers, for claimant.

ADAMS, District Judge. This action was brought by C. W. Crane & Company, as managing owners of the 3 masted schooner A. P. Emerson, to recover from the steam-propeller Chelsea, the damages caused to the schooner by a collision which happened between the vessels in Long Island Sound, about ¾ of a mile southwest of Execution Rock Light, about 7 o'clock in the evening of the 8th day of April, 1904. The tide was ebb.

The schooner was 125 feet long and 29.6 beam and bound to New York from St. John, New Brunswick, with a load of lumber, partly on deck. She was sailing free, with her booms on the starboard side. At the time of the collision, she had all her lower sails set, consisting of a spanker, mainsail, foresail, fore head sails, fore staysail, jib, flying jib and outer jib. The topsails were furled as the schooner was passing Execution Light and the last of them was being clewed up when the lights of the steamer were first seen. When in the vicinity of the collision the schooner was steering a S. W. course. The wind was about North-east by East or East North-east. It is claimed by the schooner that she was sailing just before the collision, at the rate of 4½ or 5 knots, the weather being rainy and nasty but lights easily seen. The master was at the wheel and a lookout duly stationed forward. A Hell Gate Pilot and his son were also on deck. Her proper lights were set and burning. It is also claimed by the schooner, that the Chelsea's masthead light appeared shortly before the collision, about ½ or ¾ of a point on her starboard bow; that the steamer's green light then appeared and subsequently red so that at the time of the collision, she was showing both. The schooner was struck by the steamer's stem on the starboard side forward of the fore rigging. The schooner commenced to sound fog signals when in the vicinity of Execution Light.

The Chelsea was a screw propeller 144 feet long, bound from New York to New London and Norwich, Connecticut, laden with freight and carrying passengers. Her ordinary speed in still water was about 10 knots. She claims that a few minutes after passing Stepping Stones she met with fog, and there changed her course to N. E. ¼ N. to pass Execution Light; that a few minutes later, it shut in thick and she commenced to blow fog signals. No change was made from full speed and she was going according to the master's estimate, at the rate of 8 knots, when the lookout reported a whistle or horn forward, which the master told him must be Execution Light, on account of its being long drawn out. A few seconds afterwards the lookout reported again that he thought he heard 3 whistles, 3 horns, on the starboard bow. The master looked but did not see anything and kept his course. In a few seconds, both lights of the schooner appeared, about half a point to the starboard and the master ordered the steamer's wheel to starboard, which order was obeyed to the extent of two spokes, when the schooner's green light disappeared to the steamer and the red came out plain. The master then ordered the steamer's helm to be ported and just at that time the red light commenced to disappear and a bell was given on the steamer to slow and suddenly the green light showed up and the steamer gave three bells and a jingle. The master estimates that when the lights were first seen they were about 1200 feet away but elsewhere says that he could see lights or objects on the water ½ or ¾ of a mile away. The schooner was struck on the starboard bow. It is estimated that the steamer at the time of collision had been reversing about 50 seconds, with the effect of bringing her quick water forward to the gangway about 35 feet aft of the stem. The steamer was loaded by the stern so that she drew there 11 feet while only drawing 6½ forward. The master explains the retention of full speed by the necessity of keeping the time of the run from Stepping Stones to Execution Light and because, trimmed as she was, she would not steer very well if slowed down.

The steamer's master admitted that he knew from the whistles he heard, that there was a sailing vessel coming towards him with a fair wind. There is no serious contention about the steamer's faults in several respects, principally in proceeding at full speed in a fog, which is claimed to have been dense, but an apportionment of the damages is sought, because of the schooner's speed, which, it is contended by the steamer, was at least 6 or 7 knots per hour, which rate in fog has been condemned by the authorities.

The speed of the schooner is therefore the only point that requires consideration.

The master of the schooner testifies that the fog signals were commenced on the schooner when she was two or three miles E. N. E. of Execution Light; that the fog then began to shut down and the signals were started; that he began to take in topsails at Execution Light and had them all in but not hauled snug to the masthead at the time of collision; that at Execution Light it was quite thick and he hauled to the South-west to get into the chan-

nel, which gave the wind a better hold on his sails and sent the vessel a little faster forward. He afterward said it lightened up a little off Execution Light, so that he could see at least a mile away. It appears that a log had been kept by the mate, who was examined out of court for the libellant, and this was called for by the claimant but not produced, because the master claimed it had been destroyed, with other papers, by water getting into his cabin from the collision, but the master's testimony differs from the mate's and is somewhat to be doubted in this respect, at least. The mate testified that the entries concerning this occurrence were made in the morning of the next day. He also said that the schooner was making 7 or 8 knots when Sands Point was abeam. The lookout estimated the speed at 6 knots. The Hell Gate Pilot, who went aboard at a point opposite Eatons Neck, estimated the speed at not over 5 miles, and at time of collision not over 5 knots, from 5 to 6 miles. He describes the weather misty and foggy, "not exactly foggy but mist with a fog, just coming on to be foggy." The light keeper at Execution Light testified that when the Emerson passed he saw her plainly and with glasses could read her name; that at the time he could see Sands Point Light ⅞ of a mile away and other lights in the vicinity; that after she passed by him she went into the fog, possibly ¼ of a mile away, and was shut out from his view; that before the Emerson went by, he started his fire to get up steam for the fog whistle kept there, which he started at 7:15 o'clock.

It appears by the chart that Eatons Point Light on Eatons Neck, is about 20 nautical miles from Execution Light and as the collision occurred a little to the westward of the latter and the schooner passed the former about 4 o'clock, a speed of something over 6 knots appears. At the time of collision, the schooner was still carrying all of her lower sails and as they were receiving some benefit from the change of course at Execution Light, it may safely be assumed that when the vessels came together, the schooner was going as much as 6 knots.

The question to be determined is whether the schooner under the circumstances was in fault for excessive speed. The claimant so contends, citing several cases where such a rate in a fog has been held to be condemnatory. The difficulty with the steamer's contention is, that she assumes the schooner to have been sailing in a dense fog. The preponderance of the testimony is to the effect that the schooner was not sailing in such a fog. She was doubtless sailing into the one of that character in which the steamer had been navigating, but the schooner had not reached the dense part at the time of collision. The testimony indicates that the steamer was coming out of it. Probably the schooner, in the exercise of greater precaution, should have reduced sail before she did, but her action in this respect is not so obviously negligent as to involve her in the responsibility for the collision, which can be fully accounted for by the steamer's plain faults.

The steamer was on a course which would have carried her safely clear of the schooner, starboard to starboard, and she starboarded

her wheel slightly to give further margin. She suddenly, however, changed because the steamer's master said the schooner, after showing both her lights, about ½ point to the starboard, changed to the red alone, when he ported. Then, he says, the red commenced to disappear and the green showed up, when he gave stopping and reversing bells. The testimony for the schooner, however, shows that she did not change her course, which seems to be true in this respect. The schooner not changing, why the steamer should have made her last change is not apparent, unless it was to avoid another schooner, which was sailing in the same direction as the Emerson, on her starboard side.

Under all the circumstances, I do not consider it a case in which the schooner should be held as a participant in the negligence, which caused the damages.

Decree for the libellant, with an order of reference.